UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------- X

UNITED STATES OF AMERICA,

                    *Plaintiff*,

        -against-

JAMES JOSEPH,

                    *Defendant*.
-------------------------------------- X

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

18-CR-00002(KAM)

**MATSUMOTO, United States District Judge:**

        On August 24, 2015, James Joseph (the "defendant")
pled guilty in the United States District Court for the Western
District of Virginia to Access Device Fraud in violation of 18
U.S.C. § 1029(c), a Class C felony. (ECF No. 3, Violation of
Supervised Release Report ("First VOSR Report") 3.) Defendant
was thereafter sentenced to twenty months' imprisonment, to be
followed by three years of supervised release. (*Id.* 4.)
Defendant's supervised release term commenced on November 25,
2016. (*Id.* 1.) On December 22, 2017, the Western District of
Virginia District Court transferred jurisdiction of this case to
the Eastern District of New York, and the matter was assigned to
the undersigned. (*Id.* 5.)

        On January 10, 2018, the United States Probation
Department for the Eastern District of New York ("Probation

1

Department") filed the first of three Violation of Supervised Release Reports, charging defendant with five counts of violating his supervised release conditions. (ECF No. 3, First VOSR Report.)  The Probation Department filed two subsequent reports on September 18, 2019, and December 3, 2019, charging defendant with twelve additional violations.  (*See* ECF No. 31, Violation of Supervised Release: Supplemental Report ("Second VOSR Report"); ECF No. 38, Violation of Supervised Release: Supplemental Report ("Third VOSR Report").)  On April 6, 2020, the government filed a motion to revoke defendant's term of supervised release.  (ECF No. 54, Motion to Revoke Defendant's Term of Supervised Release ("Gov't Mot.").)  On February 11 and 13, 2020, the court held a revocation hearing.  (*See* Minute Entries dated Feb. 11, 2020 and Feb. 13, 2020.)

Upon consideration of the parties' submissions, and the credible evidence adduced at the revocation hearing, the court makes the following findings of fact and conclusions of law.  For the reasons set forth below, the court concludes that the government has proved Charges One through Four and Six through Seventeen by a preponderance of the evidence, and grants the government's motion to dismiss Charge Five.

**FINDINGS OF FACT**

## I. Background

### A. Original Sentence

After his guilty plea on August 24, 2015, defendant was sentenced to a twenty-month custodial term and a three-year term of supervised release with the following special conditions:

> 1) The defendant shall provide the probation officer with access to any requested financial information; 2) The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer; 3) The defendant shall reside in a residence free of firearms, ammunition, destructive devices, and dangerous weapons; and 4) The defendant shall permit a warrantless search and seizure of person and property as directed by the probation officer, to determine whether the defendant is in possession of firearms or unapproved financial access devices.

(First VOSR Report 4.) Defendant's supervised release also included the condition that he "shall not commit another federal, state or local crime." (*Id.* 5-6.)

### B. New York State Criminal Case

On January 17, 2018, defendant was indicted by a New York State grand jury in Brooklyn, New York for three counts of Rape in the Third Degree, and two counts of Endangering the Welfare of a Child ("State Case"). (ECF No. 33, Gov't Ltr. 2.) The indictment charged that on November 8, 2017, defendant had sexual intercourse three times with a female who was 15 years old at the time ("Victim"), and also provided her with

marijuana.  On November 9, 2017, the Victim went to Brookdale
Hospital and claimed to Emergency Department personnel that,
while walking home, she had been forcibly raped.  (ECF No. 45,
Gov't Reply 1.)  The Victim consented to an Emergency Department
physician performing a sexual offense evidence collection kit on
her.  (*Id.*)  Later that same day, the Victim was interviewed by
Detective Aubrey Henry of the Special Victims Squad of the New
York Police Department ("NYPD").  (*Id.*)  During the interview
with Detective Henry, the Victim partially recanted her earlier
account: she had not been forcibly raped, but rather had
consensual sex with a male.  (*Id.*)  Later on November 9, the
Victim identified the defendant in a photo array as the person
with whom she had sex.  (*Id.*)

After the defendant was arrested on January 8, 2018,
the Victim identified him yet again from a lineup as the person
with whom she had consensual sex on November 8, 2017.  (Gov't
Reply 1.)  Three days later, on January 11, the Victim gave
sworn testimony to a New York State grand jury.  (*Id.* 1-2.)  The
Victim testified that she and the defendant engaged in sexual
intercourse three times on November 8, 2017.  (*Id.* 2.)  The
Victim further explained that she initially told personnel at
Brookdale Hospital that she had been raped in order to get
medical treatment.  As part of the grand jury proceeding, the
Kings County District Attorney's Office ("DA") also offered the

testimony of Criminalist, Jennifer Dorry, of the Office of the Chief Medical Examiner ("OCME"), and Detective Henry. (Gov't Ltr. 2.)

On May 22, 2019, the DA dismissed the State Case because the Victim refused to cooperate in defendant's prosecution. (*Id.* 3)

### C. Violations of Supervised Release

#### 1. The First VOSR Report

On January 8, 2019, the government charged the defendant for violations of mandatory conditions of supervision. The First VOSR Report contains five charges, the first four of which pertain to the State Case, which Probation asserts violated the mandatory condition of supervision that "[t]he defendant shall not commit another federal, state or local crime." (First VOSR Report 5-6.) Specifically, Charges One through Four are:

- **Charge One:** Rape 3rd Degree: Victim Less than 17 Years Old/Perpetrator 21 Years or More, a Class E Felony;

- **Charge Two:** Forcible Touching-Touch Sexual/Intimate Parts of Another, a Class A Misdemeanor;

- **Charge Three:** Acting in a Manner to Injure a Child Less than 17, a Class A Misdemeanor;

- **Charge Four:** Sexual Abuse-3rd Degree: Subjecting Another Person to Sexual Contact Without Consent, a Class B Misdemeanor.

(*Id.*)  Charge Five of the First VOSR Report charges that
defendant tested positive for marijuana use.  (*Id*. 7.)  At the
time of his original sentencing, however, the court did not
order that defendant submit to mandatory drug testing.
Accordingly, the government has moved to dismiss Charge Five,
which motion is granted.

### 2. Additional Conditions of Supervised Release

On January 18, 2019, defendant reportedly appeared at
the Probation Department's offices smelling of marijuana, and
declined to take a voluntary drug test.  (ECF No. 24, Request
for Modifying the Conditions or Term of Supervision ("Gov't
Req.") 2.)  On February 11, 2019, defendant failed to report to
the Probation Department.  (*Id.*)  Defendant appeared the
following day, February 12, and again refused to take a
voluntary drug test.  (*Id.*)

In a March 25, 2019 filing, the Probation Department
proposed a modification of defendant's conditions of supervised
release to include substance abuse testing and outpatient drug
treatment.  (*Id.*)  Defendant agreed to the proposed modification
and signed a form acknowledging the agreement while voluntarily
waiving his right to a hearing.  (*Id*. 2, 4.)  On March 26, 2019,
the court so-ordered the modification, which required defendant
to participate in an outpatient drug treatment program approved
by the Probation Department and to submit to drug testing during

6

and after outpatient drug treatment to ensure abstinence from
drugs and alcohol.  (*Id.* 1.)

### 3. The Second and Third VOSR Reports

In September and December 2019, the Probation
Department filed two supplemental reports containing additional
charges against defendant for violations related to drug testing
and outpatient treatment.  (Second VOSR Report; Third VOSR
Report.)  The Second VOSR Report added three additional VOSR
charges for failing to submit to drug testing on three
occasions. (Second VOSR Report.)  Specifically, Charges Six
through Eight of the Second VOSR Report state:

- **Charge Six:** Failure to submit to drug testing on August
  14, 2019;

- **Charge Seven:** Failure to submit to drug testing on August
  29, 2019;

- **Charge Eight:** Failure to submit to drug testing on
  September 11, 2019.

(*Id.*)

On December 3, 2019, in a third VOSR, the Probation
Department added nine charges for violations relating to the
special conditions for drug testing and treatment and reporting
to the Probation Officer.  (Third VOSR Report.)  Specifically,
Charges Nine through Seventeen of the Third VOSR Report are:

- **Charge Nine:** Failure to participate in an outpatient drug
  treatment program on November 5, 2019;

7

- **Charge Ten**: Failure to participate in an outpatient drug treatment program on November 8, 2019;

- **Charge Eleven:** Failure to participate in an outpatient drug treatment program on November 12, 2019;

- **Charge Twelve:** Failure to participate in an outpatient drug treatment program on November 13, 2019;

- **Charge Thirteen:** Failure to participate in an outpatient drug treatment program on November 16, 2019;

- **Charge Fourteen:** Failure to participate in an outpatient drug treatment program on November 18, 2019;

- **Charge Fifteen:** Unlawful use of a controlled substance on November 20, 2019;

- **Charge Sixteen:** Failure to report to Probation on November 22, 2019;

- **Charge Seventeen:** Failure to participate in an outpatient drug treatment program on November 26, 2019.

(*Id.*)

## II.  **The Revocation Hearing**

At the revocation hearing held on February 11 and 13, 2020, the court heard testimony from Emergency Room Physician, Dr. Danielle Sanchez; NYPD Detective, Aubrey Henry; OCME Criminalist, Jennifer Dorry; Probation Department Officer, Ryan Lehr; Clotilde Simons, the Director of Federal Programming at the Counseling Services of the EDNY ("CS-EDNY"); and Denise Suncin, a Counselor at CS-EDNY.  (ECF Nos. 53, 56, Revocation

Hearing Transcript ("Tr.").)[1]  The court considers the evidence

offered at the hearing and makes findings of fact below.

## A. NY Penal Law Sexual Misconduct Charges

### 1. Testimony of Dr. Danielle Sanchez

Dr. Sanchez testified that, on November 9, 2017, she

was working as an emergency room medical resident in the

pediatric emergency department of Brookdale Hospital in

Brooklyn, New York.[2]  (Tr. 13:14-19, 17:21-25; *see generally*

Gov't Ex. 1 (Victim's Medical Records dated Nov. 9, 2017).)[3]  The

Victim arrived at Brookdale Hospital at 3:58 p.m., while Dr.

Sanchez was working her shift.  (Tr. 18:1-2, 5-7; Gov't Ex. 1.)

As Dr. Sanchez treated the Victim, she noted the Victim was born

on December 27, 2001, and thus 15 years old as of November 9,

2017.  (Tr. 18:5-7, 19:5-12; Gov't Ex. 1.)  The Victim told Dr.

Sanchez that she had been sexually assaulted earlier that

morning at approximately 1:00 a.m.  (Tr. 18:18-19, 19:1-2.)  In

the Victim's initial telling, she was walking across the street

when she noticed someone behind her; after she crossed the

street, she was pushed into a lower room apartment and was

---

[1]     The transcript of the February 11, 2020 revocation hearing and the
February 13 continued hearing is consecutively paginated (pp. 1-207).
[2]     Dr. Sanchez is currently an emergency room physician at Sparrow
Hospital in Lansing, Michigan.  (Tr. 12:25-13:6.)  She attended four years of
medical school and three years of residency training.  (*Id.* 13:3-4.)

[3]     Although not filed on the docket, the government served the court and
defense counsel with copies of its exhibits.

assaulted. (*Id.* 18:21-25.)  The Victim could not tell if her assailant had ejaculated in her. (*Id.* 24:20-22.)

Dr. Sanchez explained to the Victim that she would perform a sexual assault kit and treat her for any potential sexually transmitted infections or pregnancy. (Tr. 19:14-17.) Dr. Sanchez testified that, in a typical examination, she initially explains to the patient what an examination involves, asks the patient to de-robe, and places all of the patient's clothing on their body into a bag. (*Id.* 19:23-20:1.) Next, she looks for any physical bruising and begins to collect the samples that comprise the actual sexual assault kit. (*Id.* 20:2-3.) According to Dr. Sanchez, the kit is comprised of a series of envelopes, which bear written instructions for collecting swabs and samples. (*Id.* 20:3-5.)

The Victim agreed to proceed with a sexual assault examination. (Tr. 19:18-20.) When Dr. Sanchez examined the Victim, she used the sexual assault kit to document the evidence. (*Id.* 20:8-11.) Dr. Sanchez also collected the Victim's clothing, including her underwear, which the Victim said she had not changed since the assault. (*Id.* 20:12-20.) The Victim was examined for vaginal bleeding, swelling and trauma, pelvic pain, discharge, sperm, difficulty in urination, hematuria, tenderness to palpation, and lacerations, but tested negative for the aforementioned conditions. (*Id.* 26:11-30:9.)

Dr. Sanchez also took samples from the interior of the Victim's mouth, swabbed her buccal mucosa, and undertook an invasive swabbing of the anus, cervix, and vagina. (*Id.* 20:23-21:1.) Dr. Sanchez sealed each envelope in the sexual assault kit before turning to the subsequent step in the procedure, and once the kit was finalized, she placed all envelopes in their appropriate order. (*Id.* 21:6-11.) Finally, Dr. Sanchez placed a piece of evidence tape on the outside to seal the evidence box. (*Id.* 21:12-16.)

Following the examination, Dr. Sanchez informed the Victim about the availability of prophylactic medical treatment for any sexually transmitted infections and pregnancy. (Tr. 22:2-8.) The Victim agreed to accept prophylactic treatments for chlamydia, HIV exposure, and a potential pregnancy. (*Id.* 22:8-12, 23:10-13; Gov't Ex. 1.) The Victim also expressed to Dr. Sanchez her desire not to file a police report. (Tr. 29:9-15; Gov't Ex. A.) Nonetheless, Dr. Sanchez called the police to report that the Victim, a 15-year-old girl, had been raped. (Tr. 21:22-22:1; Gov't Ex. 1.) Dr. Sanchez maintained custody of the sealed kit until the police arrived. (Tr. 21:17-21.)

2. Testimony of Detective Aubrey Henry

On November 9, 2017, Aubrey Henry, a NYPD Detective, was working as an investigator at the NYPD Brooklyn Special

Victims Unit ("SVU"). (Tr. 32:9-16.)[4] That day, he received a

hospital notification from the Special Victims Division

regarding a female sexual assault victim. (*Id.* 33:24-34:2.) He

interviewed the Victim at the Special Victims Office located at

653 Grand Avenue in Brooklyn. (*Id.* 34:7-14.) Detective Henry

immediately noted that the Victim recanted the initial account

of her sexual assault, as conveyed to Dr. Sanchez, and explained

that, in fact, she was not forcibly raped. (*Id.* 47:9-20.)

According to the Victim, on November 8, 2017, at around 11:00

p.m., she met defendant on the street near her home. (*Id.* 35:1-

5.) After the Victim exchanged names and phone numbers with the

defendant, he invited her to his apartment. (*Id.* 35:5-6, 47:24-

48:16.) Once in his apartment, they engaged in sexual

intercourse without a condom, although the Victim clarified that

"there was no oral or anal penetration." (*Id.* 35:7-9, 49:8-10.)

The Victim spent the night with defendant, and the following

morning they briefly watched television together before she

left. (*Id.* 35:9-11.)

After the Victim left defendant's apartment, she was

walking down Rockaway Parkway in Brooklyn, when she saw a

stranger and asked to borrow the woman's phone to call a friend.

---

[4]     Detective Henry has been employed by the City of New York Police
Department for almost 29 years, and, at the time of hearing, had worked as a
SVU investigator for approximately twelve years. (*Id.* 32:9-16.) Detective
Henry investigates sexual assaults and attempts that occur in Brooklyn,
including both misdemeanors and felonies. (*Id.* 32:17-22.)

(Tr. 35:12-15.)  The Victim met her friend at the latter's
school, and expressed concern about the unprotected sex she had
just engaged in.  (*Id.* 35:15-18.)  The friend encouraged the
Victim to go to Brookdale Hospital.  (*Id.* 35:19-20.)  The Victim
took her friend's advice, and told the hospital staff that she
was raped by a stranger.  (*Id.* 35:19-23.)  The hospital then
notified the SVU, leading Detective Henry to get involved in the
case.  (*Id.* 35:23-25.)

        The Victim told Detective Henry that defendant's name
was Derrick Jones and his address was 8516 Glenwood Road.  (Tr.
36:4-11.)  She also told Detective Henry that she preferred
defendant not be arrested because she had willingly had sex with
him.  (*Id.* 52:3-5.)  After interviewing the Victim, Detective
Henry checked the NYPD's Domain Awareness System ("DAS")
database, and entered the building address that the Victim had
provided to him.  (*Id.* 36:20-25, 60-61.)  Though the Victim did
not provide Detective Henry with defendant's actual name, the
DAS search for defendant's building returned an image of
defendant, which matched Victim's description.  (*Id.* 36:25-37:3,
61:4-6.)  Based on the DAS search results, Detective Henry
identified Mr. James Joseph, the defendant, as the individual
with whom the Victim had intercourse.  (*Id.* 61:13-16.)
Detective Henry prepared a photo array that included defendant.
(*Id.* 37:4-5; Gov't Ex. 2 (NYPD Photo Array).)  Detective

Christopher Mastoros showed the Victim the photo array. (*Id.* 39:3-5.)

The sexual assault kit prepared at Brookdale Hospital was sent to a lab for DNA analysis. (Tr. 40:7-13.) Once the kit was analyzed by OCME, the results showed that defendant's DNA matched the DNA from the kit. (*Id.* 40:18-41:2.) After Detective Henry was alerted to this development, he activated an Investigation Card for defendant, which notified NYPD officers that defendant was wanted regarding a crime under investigation, and could be apprehended. (*Id.* 41:11-19.)

On January 8, 2018, defendant was apprehended by police and transported to the Special Victims Office. (Tr. 41:22-42:4.) Once there, a lineup was conducted, in which defendant was asked to choose a position between one and six and stand in a room with five other people. (*Id.* 42:4-12.) The Victim stood behind a two-way mirror and viewed the lineup; she identified defendant with a high degree of confidence. (*Id.* 42:12-43:9.) Immediately thereafter, defendant was arrested and Detective Henry took possession of defendant's New York State ID. (*Id.* 33:5-11, 43:10-21; Gov't Ex. 3 (Copy of Defendant's New York State Identification Card).) According to defendant's ID, his date of birth is February 19, 1990. (Tr. 44:22-25; Gov't Ex. 3.) Thus, defendant was 27 years old on November 8, 2017, when he had intercourse with the 15-year-old Victim.

Detective Henry was the lead police officer in the case, and he made the decision about how to charge defendant. (Tr. 52:15-20.)  He spoke with the District Attorney's office to confer about the charges.  (*Id.* 52:24-53:6.)  Ultimately, defendant was charged with rape in the third degree and sexual misconduct, but not forcible rape.  (*Id.* 53:13-21, 55:3-7.)

### 3. Testimony of Criminalist Jennifer Dorry

The court qualified Ms. Dorry, without objection, as an expert in the field of DNA analysis, DNA profiles, and their statistical significance.  (Tr. 53:5-11.)  Jennifer Dorry is a Criminalist Level 4 at OCME, a DNA lab for the City of New York, affiliated with the Department of Health and Mental Hygiene. (*Id.* 71:20-72:1, 72:13.)[5]  As a Criminalist Level 4, a position Ms. Dorry has held for two years, her duties include supervising the DNA lab, reviewing case files that contain positive DNA reports, and testifying in court as needed.  (*Id.* 72:12-21.) DNA testing at OCME is performed by a forensic biology laboratory, which is accredited by the New York State Commission

---

[5]     Ms. Dorry has a Bachelor's degree in Forensic Science from John Jay College of Criminal Justice, along with Masters level coursework in specialty work such as biochemistry and genetics.  (*Id.* 72:3-6.)  She has worked at OCME for around nine years and also has worked as a criminalist at the San Francisco Police Department for around 3.5 years.  (*Id.* 72:7-11.)  She stays up to date in the field of forensic biology by reading different scientific journals and attending seminars related to DNA testing.  (*Id.* 73:9-11.) While working as a forensic scientist, Ms. Dorry has analyzed thousands of items of evidence and has developed a DNA profile thousands of times.  (*Id.* 74:12-18.)  Ms. Dorry has also testified as an expert in the field of DNA analysis, DNA profiles, and their statistical significance about twenty-five times before the Supreme Courts of all five boroughs, as well as Brooklyn, Bronx, and Queens grand juries.  (*Id.* 74:19-75:2.)

on Forensic Science as well as ANAB, a national accreditation board. (*Id.* 73:12-19.) In order to be accredited, the laboratory needs to meet certain standards; these standards apply to the personnel who are hired and their training program, to the different protocols used within the laboratory. (*Id.* 73:23-74:3.)

On November 10, 2017, OCME received the Victim's sexual assault evidence collection kit, assigned file number FB No. 1706736. (Tr. 81:24-82:12; Gov't Ex. 4 (Forensic Biology Case File No. FB17- 06736).) The kit that OCME received contained the Victim's oral swabs, oral smear, a buccal specimen, trace evidence, underwear, fingernail scrapings, pulled pubic hairs, pubic hair combings, perianal smears, perianal swabs, anal swabs, vulvar swabs, vulvar smear, vaginal swabs, vaginal smears, cervical swabs, and a cervical smear. (Tr. 82:13-23; Gov't Ex. 4.) The actual swabs taken from the Victim's body were screened for male DNA, using the OCME's special screening test that looks specifically for male DNA in cases where there is an alleged male assailant. (Tr. 83:1-7.) Male DNA was detected on the Victim's perianal swabs, anal swabs, vulvar swabs, vaginal swabs, cervical swabs, and on her underwear. (*Id.* 83:21-23; Gov't Ex. 4.) From this screening test, two samples were selected: Underwear Stain Four and the cervical swab. (Tr. 94:15-16.) However, the cervical swab

lacked a sufficient concentration of DNA under OCME's standards to move forward with further testing. (*Id.* 94:17-19.)

Underwear Stain Four was sent away for a differential extraction, a DNA extraction process applied when OCME believes that a specimen might contain semen. (Tr. 84:4-7; Gov't Ex. 4.) Ms. Dorry then developed a 22-locus DNA profile from Male Donor A, which means that at every single location that they tested on the DNA, she was able to interpret a full DNA profile of a male. (Tr. 84:18-24; Gov't Ex. D.) She also determined that there was only one contributor from the DNA sample. (Tr. 91:1-93:8.) However, Ms. Dorry could not opine regarding how the sample ended up on the Victim's underwear. (*Id.* 101:4-6.)

On October 26, 2018, the OCME received a DNA sample from defendant bearing file number FBS1804269, collected pursuant to court order. (Tr. 85:13-86:12; Gov't Ex. 5 (Forensic Biology Case File No. FBS18- 04269).) A DNA profile was developed from defendant's sample and compared to the DNA profile developed by OCME from Underwear Stain Four. (Tr. 86:13-24; Gov't Ex. 5.) Based on the comparison, Ms. Dorry calculated that it was ***3.18 quadrillion (3.1 x 10^{15}) times more probable*** that the DNA results for Underwear Stain Four originated from defendant than from another, unknown person. (Tr. 87:5-15; Gov't Ex. 5.) In other words, Ms. Dorry "determined that the DNA profile of James Joseph matched the DNA

profile of Male Donor A" generated from the sperm sample on
Underwear Stain Four.  (Tr. 87:1-5.)

**B. General Non-Compliance**

### 1. Testimony of Probation Officer Ryan Lehr

Probation Officer Lehr supervised defendant
approximately once monthly beginning in June 2017.[6]  (Tr. 103:22-
25; 104:9-19.)  Officer Lehr testified that defendant violated
the following conditions of his supervised release term: to not
obtain any new local, state or federal charges; to comply with
drug testing and not test positive for any drug use; and
successfully participate and complete an outpatient drug
program.  (*Id.* 105:3-11.)  Defendant obtained new charges in
January 2018, tested positive for marijuana several times, and
was unsuccessfully discharged from a treatment program.  (*Id.*
105:12-16.)  As a result, Officer Lehr filed three reports
documenting defendant's supervised release violations.  (*Id.*
105:17-21.)

Officer Lehr testified that when he began supervising
defendant in June 2017, defendant was subject to mandatory
conditions, including three drug tests during supervision,[7]

---

[6]     Officer Lehr has worked for the Probation Department for 3.5 years.
(*Id.* 102:25-103:3.)  Before working for Probation, he was employed by United
States Pretrial Services in the Eastern District for seven years, and was a
New Jersey State Probation Officer for 3.5 years before that.  (*Id.* 103:5-8.)

[7]     After reviewing the original Judgment, the government clarified that,
"at the time of his sentencing, the defendant was exempted from mandatory
drug testing."  (Gov't Mot. 3.)

standard conditions of supervision, a restitution condition, and
maintaining employment.  (Tr. 106:1-6, 126:9-11.)  Defendant
failed his third drug test by testing positive for marijuana.
(*Id.* 106:10-13.)  On October 4, 2017, and October 19, 2017,
defendant again tested positive for marijuana.  (*Id.* 106:24-
108:2; Gov't Exs. 6, 7.)

On January 8, 2018, defendant was arrested on charges
of statutory rape.  (Tr. 108:13-16.)  After receiving notice of
the charges from the NYPD, Officer Lehr filed the First VOSR
Report and requested a warrant to serve as a detainer.  (*Id.*
108:17-21; *see generally* First VOSR Report.)  Defendant was
detained from January 8, 2018 until his arraignment in July
2018.  (Tr. 109:17-22.)  While detained, defendant did not take
any drug tests.  (*Id.* 109:23-110:2.)  Upon his release, in
August 2018, defendant was administered a drug test and the
results were negative.  (*Id.* 110:3-8.)

In or around January or February 2019, defendant
reportedly smelled of marijuana during a visit to the Probation
Office.  (Tr. 110:11-14.)  Defendant was asked to take
additional drugs tests, but declined.  (*Id.* 110:11-17.)  Officer
Lehr then asked defendant to sign a voluntary waiver to
institute a special condition for drug testing and treatment,
and although defendant initially declined, he ultimately signed
the waiver after consulting with defense counsel.  (*Id.* 110:18-

22.)  On March 26, 2019, the court imposed the agreed-upon modification.  (*Id.* 111:1-2.)  In April 2019, defendant was asked to take a drug test, which he did, and the results came back positive for marijuana.  (*Id.* 111:3-9.)  Officer Lehr referred defendant to outpatient treatment at CS-EDNY, a contract treatment provider for the Probation Department.  (*Id.* 111:12, 112:3-4.)

On July 24, 2019, Officer Lehr was notified by defendant's treatment program that, to date, he had a 92% attendance rate.  (Tr. 127:8-24.)  As of August 15, 2019, defendant had a 95% attendance rate.  (*Id.* 128:14-20.)  Further, defendant had made a diligent effort to make up for certain missed appointments.  (*Id.* 129:21-23.)  Starting around August 2019, however, defendant violated the outpatient treatment conditions on three occasions: on August 14 and 29, 2019, he refused to be drug tested at the program, and on September 11, 2019, he attempted to adulterate his urine sample.  (*Id.* 111:15-18, 113:23-114:3.)  After September 11, 2019, defendant was attending outpatient treatment about four times a week, either as an individual or for in-group sessions.  (*Id.* 133:24-134:6.)

In October 2019, the court asked the Probation Department and the outpatient provider to modify defendant's treatment schedule in order to improve his attendance.  (Tr. 114:23-115:1.)  Defendant's attendance improved, but he still

failed to appear for his outpatient treatment sessions on six occasions in November 2019. (*Id.* 115:5-16.) On November 20, 2019, defendant again tested positive for marijuana. (*Id.* 121:24-123:3; Gov't Ex. 8.) Officer Lehr asked defendant to report to the Probation Office on November 22, 2019 to discuss defendant's spate of absences from outpatient treatment, but defendant failed to report. (Tr. 115:17-23.) On November 26, 2019, defendant was discharged from the outpatient program due to his noncompliance and poor behavior. (*Id.* 115:24-116:1.)

## 2. Testimony of Director Clotilde Simons

Clotilde Simons is the Director of Federal Programming at CS-EDNY, with responsibility for overseeing federal substance abuse treatment contracts, supervising clinicians working on the contract, and monitoring the treatment of federal probationers.[8] (Tr. 148:6-20.) Ms. Simons testified that defendant started treatment at CS-EDNY on May 23, 2019. (*Id.* 149:14-15.) She was defendant's primary counselor for about two months, and also supervised the clinicians that worked with defendant. (*Id.* 149:11-21.) She discussed defendant's progress (or lack thereof) with the clinicians, his attendance, and any issues the clinicians might have had with defendant during his treatment sessions. (*Id.* 150:1-3.) Initially, from May to July 2019,

---

[8]    Ms. Simons is a licensed clinical social worker and a Master Credentialed Alcohol and Substance Abuse Counselor. (*Id.* 148:21-149:5.)

defendant's compliance was very good, and he was attending
treatment. (*Id.* 150:4-6.) Starting in August 2019, however,
defendant's compliance began to deteriorate, and his attendance
grew sporadic. (*Id.* 150:7-9.) Defendant also walked out on two
drug tests. (*Id.* 150:17-18.) Consequently, in September 2019,
defendant was placed on a treatment contract, which is an
intervention to help clients improve or stay engaged in
treatment. (*Id.* 150:21-24.) According to Ms. Simons, defendant
signed this contract and was aware that violating it would
result in being discharged from the program. (*Id.* 151:2-3.)

On October 28, 2019, Ms. Simons assumed the role of
defendant's primary counselor due to difficulties he was having
with other counselors. (Tr. 151:7-12.) Ms. Simons provided
defendant with a more flexible treatment schedule to accommodate
his work schedule. (*Id.* 151:13-15, 24-25.) Program sessions
were generally thirty minutes to one-and-a-half hours long.
(*Id.* 162:11-163:2.) On one or two occasions, defendant arrived
for treatment after the five-minute cut off period, and per CS-
EDNY's policy, he was not allowed to enter. (*Id.* 165:4-166:15.)
Ms. Simons specifically recalled eleven occasions in which
defendant missed treatment sessions in 2019: November 4, 5, 6,
8, 12, 13, 15, 16, 18, 22, and 25. (*Id.* 153:15-21.) Defendant
did, however, make up two of the group sessions he missed in
November 2019 (*id.* 153:23-154:2), and attended a total of 101

individual and group sessions throughout the program.  (*Id.*
158:6-16.)  Ultimately, defendant was discharged for
inappropriate behavior and non-compliance with the treatment
program's terms, and Ms. Simons approved the discharge.  (*Id.*
154:6-12.)  The discharge report stated that defendant was
working thirty-five plus hours a week.  (*Id.* 160:6-161:1.)

### 3. Testimony of Counselor Denise Suncin

Denise Suncin is a primary counselor at CS-EDNY and a
licensed master social worker.  (Tr. 178:10-19, 13-15.)  Ms.
Suncin is familiar with defendant as a client of Ms. Simons, her
supervisor, as well as the client of another co-worker.  (*Id.*
179:14-19.)  At times, Ms. Suncin would fill in for her
director.  (*Id.* 179:20-21.)  On November 22, 2019, Ms. Suncin
was instructed to meet with defendant while Ms. Simons was on
vacation.  (*Id.* 179:25-180:2.)  Defendant missed his group
session, scheduled for 5:45 p.m. that day, so Ms. Suncin gave
Ms. Simons a call to inform her.  (*Id.* 180:9-12.)  They decided
to provide defendant with a letter advising him that he needed
to meet with Ms. Suncin and Ms. Simons.  (*Id.* 180:14-18.)  Ms.
Suncin also e-mailed Officer Lehr to inform him that defendant
had missed his session.  (*Id.* 180:20-21; ECF No. 57, Def. Ex. B
(Email dated November 22, 2019).)[9]

---

[9]     Defendant's exhibits were filed together under ECF No. 57.  (*See* ECF
No. 57, at ECF p. 1, Def. Ex. A (Email dated November 11, 2019); *id.*, at ECF
p. 2, Def. Ex. B; *id.*, at ECF pp. 3-4, Gov't Ex. C (Cert. of Disposition).)

On November 25, 2019, at approximately 5:00 p.m.,
defendant arrived at CS-EDNY. (Tr. 181:13-15.) When he
appeared at the front desk, he discovered there was a urinalysis
awaiting him. (*Id.* 181:19-20.) Defendant approached the staff
member who usually administered the urinalysis and stated that
he would not take it because he was not required to. (*Id.*
181:22-24.) The staff member escorted defendant to Ms. Suncin's
office while she was treating another client. (*Id.* 181:25-
182:3, 197:17-198:2.) The staff member knocked on Ms. Suncin's
door to inform her that defendant needed to discuss his
toxicology test. (*Id.* 182:3-5.) Defendant appeared confused,
aggressive, and apparently attempted to intimidate Ms. Suncin to
ascertain her reasons for requesting a urinalysis. (*Id.* 182:17-
19.)

Ms. Suncin informed defendant that she and Officer
Lehr had agreed "to tox him." (Tr. 182:22-23.) Defendant
continued to refuse the urinalysis, and told Ms. Suncin that he
was going to call his lawyer, and that he did not have to listen
to her. (*Id.* 182:23-183:2.) Defendant's mannerisms appeared
increasingly aggressive: he was raising his voice, pacing
around, moving his arms, and behaving in a "very tantrum like
manner." (*Id.* 183:4-7, 185:9-16.) Ms. Suncin explained that
defendant could not be compelled to take the drug test, but his
refusal would be registered as a positive test. (*Id.* 183:4-6.)

Still, defendant refused the test. (*Id.* 183:7-8.) Ms. Suncin then told defendant he needed to leave because he was causing a scene. (*Id.* 183:10-12.)

Ms. Suncin subsequently called Ms. Simons and they agreed to discharge defendant from the treatment program. (Tr. 183:16-22.) Ms. Suncin also asked her coworker, Valerie Morales, to come in and discuss with defendant how his behavior was inappropriate, and to remind him of the expectations of treatment program. (*Id.* 184:1-4.) At one point, Ms. Suncin noticed that Ms. Morales was also getting upset by defendant's conduct, so Ms. Suncin intervened and told defendant that he was discharged from the program. (*Id.* 184:14-18.)

## CONCLUSIONS OF LAW

### I. Applicable Law

"Federal supervised release is a flexible system created by Congress 'to assist individuals in their transition to community life.'" *United States v. Hightower*, 950 F.3d 33, 37 (2d Cir. 2020) (quoting *United States v. Johnson*, 529 U.S. 53, 59 (2000)). "[S]entencing courts have broad discretion to tailor conditions of supervised release" to facilitate the goals of the United States Sentencing Guidelines ("USSG"), *United States v. Myers*, 426 F.3d 117, 124 (2d Cir. 2005) (citations omitted), which include the need to adequately deter criminal conduct, protect the public from further criminal acts by the

defendant, and provide the defendant with necessary training, care, or treatment. *See* USSG § 5D1.3(b).

"[R]evocation proceedings [do not have] the full range of procedural safeguards associated with a criminal trial because a probationer already stands convicted of a crime." *Hightower*, 950 F.3d at 37 (citation omitted); *see also United States v. Carthen*, 681 F.3d 94, 99 (2d Cir. 2012) ("Revocation proceedings are not deemed part of a criminal prosecution, and, therefore, defendants in such proceedings are not entitled to the full panoply of rights that criminal defendants generally enjoy." (internal quotation marks and citation omitted)). Critically, the government need only prove a violation of the conditions of supervised release by a preponderance of the evidence, rather than beyond a reasonable doubt. 18 U.S.C. § 3583(e)(3); *see also* Fed. R. Crim. P. 32.1(d). In addition, the Federal Rules of Evidence are inapplicable in the context of revocation proceedings. Fed. R. Evid. 1101(d)(3); *United States v. Pelensky*, 129 F.3d 63 (2d Cir. 1997) (finding that "most of the fundamental constitutional procedural protections that are normally applicable to a criminal prosecution are not required for supervised-release proceedings as a matter of constitutional law").

## II.   Analysis

### A. Sexual Misconduct Charges

The government has established by a preponderance of the evidence that defendant violated the terms of his supervised release by committing certain sexual offenses involving a minor in violation of the New York Penal Law ("NYPL").  It is undisputed that, in November 2017, defendant, then 27 years old, engaged in sexual intercourse with the Victim.  The Victim, who was only 15 years old at the time, was legally incapable of granting consent to defendant's sexual act.  *See* NYPL § 130.05(3)(a) (a person less than 17 years old is incapable of consent).  Whether or not specifically stated, the victim's lack of consent is an element of every sexual offense under New York law.  *Id.* § 130.05(1).  As discussed below, the government has further proved, by a preponderance of the evidence, the elements of rape in the third degree, forcible touching, acting in a manner to injure a child, and sexual abuse in the third degree.

### 1. Rape in the Third Degree (Charge One)

A person is guilty of rape in the third degree under New York law when, "[b]eing twenty-one years old or more, he engages in sexual intercourse with another person less than seventeen years old."  NYPL § 130.25(2).  Defendant's knowledge of the minor's age is not an element of the crime to be proved by the People, nor is the defendant's ignorance or belief with

respect to the minor's age a defense. *Id.* § 15.20(3).
Moreover, the fact of intercourse can be proven by some
combination of a victim's sworn testimony, contemporaneous
statements, physical evidence, and witness testimony. *See,
e.g., People v. Nash*, 87 A.D.3d 757, 758 (N.Y. App. Div. 2011)
(affirming conviction for rape in the third degree based
principally on victim's testimony despite lack of medical
evidence to corroborate victim's account); *People v. Kelly*, 270
A.D.2d 511, 511 (N.Y. App. Div. 2000) (affirming conviction for
rape in the third degree even though testimony of victim was
partially contradicted by the testimony of her friend, there was
no medical proof or proof of sexual relations between victim and
defendant other than her testimony, and she did not report the
crime until 18 months after it occurred). Moreover,
"corroboration is not required for sex offenses such as rape in
the third degree where a victim's incapacity to consent is a
product of his or her age." *People v. Alford*, 287 A.D.2d 884,
886 (N.Y. App. Div. 2001).

The government has established by a preponderance of
the evidence that defendant engaged in sexual intercourse with a
minor and thereby committed rape in the third degree. First,
the Victim's statements and actions, standing alone, constitute
compelling evidence that she, as a minor, engaged in sexual
intercourse with defendant on November 8, 2017. The Victim made

near-contemporaneous statements regarding the sexual contact to Dr. Sanchez at Brookdale Hospital in the immediate aftermath of her encounter with defendant. Though the Victim's now-retracted account of forcible rape was false, she maintained then, and consistently thereafter, that she had engaged in sexual intercourse involving vaginal penetration. Indeed, the Victim allowed Dr. Sanchez to administer an uncomfortable physical exam and an invasive evidence collection routine that included swabs of her mouth, anus, cervix, and vagina, as well as pregnancy testing and medications to prevent sexually transmitted infections. The Victim's willingness to subject herself to such an invasive procedure is entirely consonant with the reason for her visit, as later explained in her statement to Detective Aubrey Henry, to seek prophylactic treatment for potential sexually transmitted diseases and unintended pregnancy.

The Victim also told Detective Henry that the person she had intercourse with lived in a first-floor apartment at 8516 Glenwood Road, which is defendant's home address. Although the Victim stated to Dr. Sanchez on November 9, 2017 that she had been forcibly raped, her subsequent statement to Detective Henry that she had willingly engaged in intercourse with the defendant was not materially different from her original statement because she nonetheless identified defendant as the person with whom she had intercourse. Two months later, on

January 8, 2018, the Victim identified the defendant from a lineup as the person with whom she had sexual relations on November 8, 2017.[10]

In addition, the government's DNA evidence is highly compelling. Based on a comparison of defendant's DNA sample with DNA extracted from the sperm cell fraction on underwear worn by the Victim on the day of her sexual encounter with defendant, and relinquished to Dr. Sanchez on November 9, 2017, OCME concluded that it was "approximately 3.18 quadrillion [] times more probable if the sample [on Victim's underwear] originated from James Joseph than if it originated from an unknown person." (Gov't Ex. 5.) Criminalist Jennifer Dorry thus "determined that the DNA profile of James Joseph matched the DNA profile" generated from the sperm sample on Underwear Stain Four. (Tr. 87:1-5.) The OCME laboratory report and testimony of Ms. Dorry, coupled with the Victim's statements, actions, and identification of defendant, amount to virtually ironclad proof that defendant engaged in sexual intercourse with the Victim on November 8, 2017.

---

[10] Although the Victim's statements to Dr. Sanchez and Detective Henry are hearsay, the court previously held that her statements constituted admissible evidence given the diminished procedural safeguards of a revocation hearing, the Victim's unavailability, and the reliability of the Victim's testimony, notwithstanding her retraction concerning defendant's use of force. (ECF No. 50, Memorandum and Order dated Feb. 4, 2020.) In addition to statements in evidence, the court also found the Victim's statements reliable, and thus admissible, based on her January 11, 2018 sworn testimony to a New York State grand jury, when she attested that she engaged in sexual intercourse with defendant. (*Id.* 14.)

The court finds that the government has proved Charge One by a preponderance of the evidence and established that defendant is guilty of rape in the third degree under New York law. Defense counsel's contentions to the contrary are meritless. Defendant argues the Victim's statements do not support the defendant's guilt of the charged offense. (ECF No. 55, Def. Ltr.) For example, defendant notes that the Victim was unsure whether defendant had actually ejaculated into her. Yet, ejaculating into the victim is not an element of rape in the third degree. Defendant also highlights the inconsistency between the Victim's initial statement that she had been forcibly raped with her subsequent retraction of that claim. The court already dispensed with this argument in the February 4, 2020 Memorandum and Order, and does so again now, because the Victim's statements are consistent with respect to the dispositive fact of intercourse. Rape in the third degree does not include physical force or violence as an element, and thus, the Victim's inconsistency with regard to defendant's use of force is immaterial.

Defendant also challenges the government's physical evidence on two grounds: (1) Ms. Dorry's DNA analysis did not include any determination as to *how* defendant's DNA ended up on the Victim's underwear; and (2) the swab of the Victim's cervix did not have enough DNA for testing, and therefore, did not

yield a positive match for defendant's DNA. (Def. Ltr. 2.)
Both challenges are futile. As an expert in the field of DNA
analysis, it was well outside of Ms. Dorry's purview to
speculate how the semen specimen she analyzed appeared on the
Victim's underwear, and accordingly, she need not have opined on
the matter. As noted earlier, it is the Victim's statements and
identification of the defendant that establish *how* defendant's
DNA came to appear on the Victim's underwear. Further, while
Ms. Dorry did testify that there was insufficient DNA on the
Victim's cervical swab to generate a DNA profile, this is not
affirmative evidence that defendant's DNA was not present on the
cervical swab. Put differently, the absence of evidence that
the cervical swab contained defendant's DNA, was not evidence
that defendant's DNA was indeed absent from the cervical swab.
Nor does the absence of a DNA match based on the Victim's
cervical swab in any way negate the statistical near-certainty
that defendant's semen stained the Victim's underwear. In sum,
the government has proven defendant guilty of Charge One.

### 2. Forcible Touching (Charge Two)

Under New York law, a person is guilty of forcible
touching when he "forcibly touches the sexual or other intimate
parts of another person for . . . the purpose of gratifying the
actor's sexual desire." NYPL § 130.52(1). "[A]ny bodily
contact involving the application of some level of pressure to

the victim's sexual or intimate parts qualifies as a forcible touch." *People v. Guaman*, 22 N.Y.3d 678, 684 (N.Y. 2014). The contact must also be for the purpose of gratifying the defendant's sexual desire, but the law does not require that the defendant experience any actual gratification, only that the touching be for the "purpose" of gratifying the actor's sexual desire. *People v. Teicher*, 422 N.E.2d 506, 510 (N.Y. 1981). Because gratification "generally presents a subjective inquiry, the sexual gratification component of the offense may properly be inferred from the perpetrator's conduct itself." *People v. Sumpter*, 190 Misc. 2d 115, 117 (N.Y. App. Term 2001) (citations omitted).

Here, the court can readily infer, based on the Victim's statements describing vaginal intercourse on November 8, 2017, her willingness to undergo invasive examination and accept prophylactic treatment for sexually transmitted diseases and pregnancy, and her identification of defendant, that defendant forcibly touched the Victim, and did so for the purpose of sexual gratification. The government has thus proved, by a preponderance of the evidence, that defendant is guilty of Charge Two, forcibly touching the Victim under the NYPL.

### 3. Acting in a Manner to Injure a Child (Charge Three)

Under New York law, a person is guilty of acting in a manner to injure a child, if he "knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old."  NYPL § 260.10(1). This crime is also known as endangering the welfare of a child. "By its nature, the crime of endangering the welfare of a child 'may be committed either by one act or by multiple acts and readily permits characterization as a continuing offense over a period of time.'"  *People v. Hughes*, 114 A.D.3d 1021, 1024 (N.Y. App. Div. 2014) (quoting *People v. Keindl*, 502 N.E.2d 577, 582 (N.Y. 1986), *superseded on other grounds by* NYPL § 130.75).

By engaging in sexual intercourse with the Victim, defendant committed conduct likely to be injurious to the physical, mental, or moral welfare of a minor.  *See People v. Sanders*, 47 A.D.3d 1061, 1062 (N.Y. App. Div. 2008) ("[T]he endangering the welfare of a child count required only a finding of sexual intercourse."); *see also People v. Baker*, 24 A.D.3d 810, 811 (N.Y. App. Div. 2005) ("[T]he crime of endangering the welfare of a child, as charged by County Court, required only that defendant acted in a manner likely to be injurious to the welfare of a child by soliciting the victim to engage in sexual relations.").  Accordingly, the government has proved Charge

Three, establishing by a preponderance of the evidence that defendant acted in a manner likely to be injurious to the welfare of a child.

### 4. Sexual Abuse in the Third Degree (Charge Four)

Under New York law, a person is guilty of sexual abuse in the third degree when he "subjects another person to sexual contact without the latter's consent." NYPL § 130.55. Sexual contact means "*any touching* of the sexual or other intimate parts of a person . . . for the purpose of gratifying sexual desire of either party." *Id.* § 130.00(3) (emphasis added). Here, defendant and the Victim, a minor incapable of consent, engaged in sexual intercourse. For those reasons, the government has proved Charge Four by a preponderance of the evidence and established that defendant committed sexual abuse in the third degree.

### B. Drug Use, Drug Testing, and Drug Treatment Conditions

The remaining charges, Six through Seventeen,[11] concern defendant's failure to comply with the drug testing and outpatient treatment conditions of his supervised release. For the reasons that follow, the government has proved these charges by a preponderance of the evidence.

---

[11] As noted above, the court grants the government's motion to dismiss Charge Five, which alleged that defendant tested positive for marijuana use in October 2017. (Gov't Mot. 1 n.1.)

1. <u>Failure to Submit to Drug Testing (Charges Six through Eight)</u>

On March 26, 2019, based on defendant's knowing and voluntary agreement with the Probation Department, the court entered an order modifying defendant's conditions of supervised release by requiring defendant to "submit to testing during and after [outpatient drug] treatment to ensure abstinence from drugs and alcohol." (ECF No. 25.) Officer Lehr's uncontroverted testimony at the revocation hearing established that defendant refused to take toxicology tests on August 14, 2019 and August 29, 2019, and attempted to adulterate his urine specimen on September 11, 2019. (*See* Tr. 111-14.)

Defense counsel insists that defendant was not subject to a special condition for drug testing at the outset of his supervised release term, and defendant complied with the special condition once imposed by the court. (Def. Ltr. 3.) The first assertion is a non-sequitur: Charges Six through Eight are plainly based on defendant's conduct *after* the court's March 26, 2019 order modifying defendant's conditions of release by, *inter alia*, imposing a drug testing condition. The lack of a drug testing condition at the outset of defendant's supervised release term is plainly irrelevant to the issue of whether defendant is guilty of Charges Six through Eight. Defense counsel's second assertion is flatly incorrect: Charges Six

through Eight are premised on conduct post-dating the court's March 26, 2019 modification of defendant's supervised release term.

The government has proved Charges Six through Eight by a preponderance of the evidence, namely, defendant's repeated failures to comply with the drug testing condition of his supervised release term.

### 2. Failure to Participate in Drug Treatment (Charges Nine through Fourteen, Seventeen)

Defendant's modified conditions of supervised release required him to "participate in an outpatient drug treatment program approved by Probation." (ECF No. 25.) At the revocation hearing, the government presented evidence in the form of testimony from Officer Lehr, defendant's Probation Officer, and Ms. Clotilde Simons, the federal program director for defendant's treatment program, that defendant failed to participate in treatment sessions on the following dates in 2019: November 5, November 8, November 12, November 13, November 16, November 18, and November 25. (Tr. 115, 152-53.)[12] On November 25, defendant was discharged from the CS-EDNY program after he refused to take a urinalysis, engaged in loud,

---

[12] Charge Seventeen refers to missed treatment on November 26, but it appears from the record and the parties' submissions that the government intended to charge defendant with failing to participate in outpatient treatment on November 25, the date he was actually discharged from the program. Defense counsel has not objected to this apparent error, and had ample opportunity to challenge Charge Seventeen at the revocation hearing.

disruptive, and altogether inappropriate behavior.  (*Id.* 181-85.)

Defense counsel nonetheless seeks to excuse and contextualize defendant's conduct.  For instance, defense counsel makes much of defendant's initial commitment to participate in the outpatient program, while ignoring his later derelictions.  (*See* Def. Ltr. 3-4.)  Indeed, Officer Lehr was informed by the treatment program that defendant's attendance rating was as high as 95% as of August 15, 2019.  (Tr. 127-28.) But defendant's initial attendance in the program, however commendable, does not negate his subsequent refusal to consistently attend and reliably participate in the program, nor does defendant cite any legal authority that would suggest otherwise.

Defendant also tries to shift the blame for his discharge by claiming CS-EDNY maintained overly rigid protocols. (*See* Def. Ltr. 4.)  For example, defense counsel adduced testimony at the hearing suggesting that if defendant was late for a session, he was denied access altogether.  (Tr. 165-66.) Defendant also avers that the demands of his work schedule frustrated his ability to comply with the program.  (Def. Ltr. 3.)  As the government implies, however, there is no contemporaneous record of defendant raising these issues with the outpatient program, nor any record of defendant seeking a

modification of his treatment hours to accommodate his work
schedule.  (*See* ECF No. 58, Gov't Reply 9.)

        The record makes clear that, beginning in August 2019,
the trajectory of defendant's participation in the treatment
program turned sharply downward when he failed two drugs tests,
and then attempted to adulterate his urine sample in September.
As a result of these lapses, CS-EDNY placed defendant on a
"treatment contract," which, as Ms. Simons explained, was
intended to help defendant stay engaged in treatment.  (Tr.
150.)  Yet defendant's attendance did not improve: he missed
eleven sessions in November 2019, and tested positive for
marijuana on November 20, 2019.  (*Id.* 122-23, 152-53.)[13]  What
followed was another missed session on November 22; a letter
from CS-EDNY advising defendant that he had to meet with the
program's treatment providers; and finally, on November 25,
defendant's outburst at CS-EDNY resulting in his discharge from
the program.  (*Id.* 180-81.)  Defendant's pattern of behavior
from August 2019 on, warrants the inference that he no longer
intended to participate in the outpatient drug treatment
program, at least in any meaningful or consistent way, as
required by his supervised release conditions.

---

[13]     Ms. Simons acknowledged that defendant made up for two missed group
sessions in November.  (*Id.* 153-54.)

Accordingly, the government has proved that defendant is guilty of Charges Nine through Fourteen, and Seventeen, by a preponderance of the evidence.

### 3. Use of a Controlled Substance (Charge Fifteen)

A mandatory and standard condition of defendant's supervised release prohibited the use of controlled substances. (ECF No. 5-4 (Conditions 2 & 7).)  It is undisputed that defendant tested positive for using marijuana, a controlled substance, *see* 21 U.S.C. § 812(c), on November 20, 2019.  (Tr. 121-23; Gov't Ex. 8.)  The government has therefore proved Charge Fifteen by a preponderance of the evidence by establishing that defendant tested positive for use of a controlled substance.

### 4. Failure to Report to the Probation Office (Charge Sixteen)

Defendant was also required to "report to the probation officer in a manner and frequency directed by the court or probations officer." (ECF No. 5-4.)  Officer Lehr testified that he asked defendant to report to the Probation Office on November 22, 2019; however, defendant failed to report.  (Tr. 115:17-23.)  This failure violated the terms of defendant's supervised release.  The government has thus proved Charge Sixteen by a preponderance of the evidence.

## CONCLUSION

Following a hearing, and upon review of the admissible evidence and parties' submissions, the court finds defendant guilty of Violation of Supervised Release Charges One through Four, and Six through Seventeen. Within one week following the entry of this Memorandum and Order, the government and defense counsel shall contact chambers to schedule defendant's sentencing and the filing of sentencing submissions.

**SO ORDERED.**

DATED:  June 26, 2020
          Brooklyn, New York

                                      /s/
                                   **HON. KIYO A. MATSUMOTO**
                                   United States District Judge